Merrick, J.
Defendant Kay’s Oasis Enterprises, Inc., d/b/a Kay’s Hair Salon (“Kay’s”), has appealed a jury verdict of $500,000.00 against it on a personal injury claim arising out of a hair-weaving treatment it performed on the plaintiff, Marie Duvivier (“Duvivier”). Although it raises a number of issues, Kay’s principal argument on appeal is that a directed verdict should have been allowed on the issue of causation of Duvivier’s injury by Kay’s treatment. In assessing the trial court’s ruling on Kay’s motion for a directed verdict, we consider the evidence in the light most favorable to the plaintiff, Duvivier. Preston v. Raia, 2008 Mass. App. Div. 280, citing Mullins v. Pine Manor College, 389 Mass. 47, 56 (1983).
Duvivier went to Kay’s Hair Salon on October 20, 2004 to have a “sewn weave” performed on her hair preparatory to a business trip to Florida. Duvivier had thin hair. In a sewn weave, nongrowing hair is sewn with a needle through the customer’s own hair to thicken it. Duvivier’s daughter had made an appointment at Kay’s with a stylist named Sonia, who was experienced in the performance of a sewn weave.
On the appointed day, when Duvivier arrived at Kay’s, she was told that Sonia had left and an employee named “Nicky” was assigned to her. Nicky proceeded to do, not a sewn weave, but a “quick weave,” which is a different procedure involving the use of glue. When Duvivier questioned her about why she was using glue, Nicky said, “I know what I’m doing,” and continued the procedure. Duvivier paid $120.00 for the treatment. No cap was placed over Duvivier’s head to protect it from the glue, as the quick weave procedure requires.
Kay’s concedes that Nicky should not have applied glue in the manner she did, that is, by permitting glue to reach Duvivier’s scalp and glued portions of the stocking to attach to her scalp and hair. Yet that is exactly what happened. Kay’s principal testified that Nicky did not do weaves back in 2004, and agreed with Duvivier’s expert that a cap should have first been placed over Duvivier’s head at the outset of the treatment. If the glue reaches the scalp, according to Duvivier’s expert, the hair and the glue will come off together.
Two days after the quick weave, while she was in Florida, Duvivier began to feel a painful burning sensation in her scalp. After a few days, she went to a hairdresser in Florida, who did not help her but told her to go back to where she had been treated to get the glue removed. The Florida hairdresser may, or may not, have attempted to remove the glued stocking from Duvivier’s head. Duvivier abandoned her trip and went home because of the “hot” pain. She returned to Kay’s, but the staff could do nothing for her.
On November 30,2004, Duvivier went to the Mattapan Community Health Center (“MCHC”) where she was seen by a nurse practitioner. She was given pain medication. On a return visit to the MCHC on December 4, 2004, Duvivier’s head was shaved so that pieces of stocking glued to her head could be removed. The pain in Duvivier’s scalp stopped after the glue and stocking were removed.
Duvivier’s hair has never grown back to its preweave, October, 2004 condition. The jury was shown her head without the wig. Duvivier wears a wig whenever she leaves her home, and has spent $3,000.00 on wigs.
1. As noted, Kay’s principal argument on appeal is that the evidence was insufficient to permit a verdict that Duvivier’s injuries, particularly the continuing bald *33 ness, were caused by the negligent treatment given her at Kay’s. It argues that Duvivier’s hair was thin to begin with, she suffers from diabetes, and she made previous statements that were vague, if not suggestive, on the subject of the treatment of her hair by the Florida hairdresser. Moreover, Kay’s asserts, the nurse practitioner at MCHC did not specifically state the cause of Duvivier’s condition and was not, in any event, qualified to do so.
Prevention of Duvivier’s condition of having glue and portions of a glued stocking attached to her hair and scalp is the purpose of the cap procedure, which was not followed by Kay’s inexperienced employee. The medical record, the admission of which we discuss infra, states: “Patient here to have her hair removed. Patient has the cap and partial weaved hair stuck on her hair.”
Where a person meets with an occurrence such as the one here and suffers injury such as that observed here, it is not speculative to infer that the injury was caused by the accident. See McCarthy v. Boston Elevated Ry., 223 Mass. 568, 573 (1916). The trial judge in this case also instructed the jury, without objection and as suggested in Massachusetts Superior Court Civil Practice Jury Instructions §2.1.8, at 2-16 (Mass. Cont. Legal Educ. 2008):
It does not matter whether other concurrent causes contributed to the plaintiff’s injuries so long as you find that the defendant’s conduct was a substantial factor in causing the plaintiffs injuries.
See Federico v. Ford Motor Co., 67 Mass. App. Ct. 454, 462 (2006). Kay’s motions on the issue of causation were properly denied.
2. The judge gave the jury instructions on personal injury damages contained in the Massachusetts Superior Court Civil Practice Jury Instructions (Mass. Cont. Legal Educ. 2008), including the instruction in §2.1.13 (b), at 2-34 to 2-35, as follows:
[Y]ou should also consider and allow a fair, reasonable sum for any permanent condition caused or resulting to the plaintiff as a result of the defendant’s wrong. This could include any permanent marks or permanent loss of bodily function. You must determine what amount will fairly and reasonably compensate for that loss.
Kay’s complains that those instructions effectively required the jury to find a permanent injury and the evidence did not include a medical opinion on that subject. “This contention ignores the principle that, in the assessment of instructions to the jury, the reviewing court examines the impact or impression of the charge as a whole upon the reasonably minded juror.” Commonwealth v. Baro, 73 Mass. App. Ct. 218, 220 (2008). The instruction does not require a finding of permanency, but sets the standard for assessing damages for “any permanent condition” the jury does find.
Moreover, “permanent injury” is defined as “[a] completed wrong whose consequences cannot be remedied for an indefinite period.” Black’s Law Dictionary 857 (9th ed. 2009). At the time of trial, the condition of Duvivier’s hair and head had remained the same for four years. The jury instruction was proper.
3. On the theory that the hairdresser in Florida was potentially a joint tortfeasor, Kay’s stated in its notice of appeal that the case should have been removed to Federal court based on diversity of citizenship, and that the Florida hairdresser was a necessary party under Mass. R. Civ. R, Rule 19(a). In its brief to this Division, Kay’s acknowledged that responsibility for removal rested with its own attorney, not with the trial court. In oral argument at least, Kay’s also acknowledged that a joint *34 tortfeasor is never a necessary party under Rule 19(a). Mongeau v. Boutelle, 10 Mass. App. Ct. 246, 253-254 (1980).
4. The records of MCHC were admitted over Kay’s objection.[2] Its objection was based on references in G.L.c. 233, §79G to “hospital medical records” and “physician.” The records in question were from a clinic and were completed by a licensed nurse practitioner. The statute defines “hospital” as one required to keep records under G.L.c. Ill, §70, which includes clinics such as the MCHC. Section 79G also defines “physician” as including “other medical personnel licensed to practice under the laws of the jurisdiction within which such services were rendered.” The records were properly certified under the penalties of perjury by an “authorized agent” of the clinic.
The key statement in the MCHC record for our purposes is: “Patient here to have her hair removed. Patient has the cap and partial weaved hair stuck on her hair.” This was not really a medical opinion at all, but rather a physical observation relevant to treatment. The clinic records were properly admitted under §79G. The Supreme Judicial Court has been quite plain about the latitude given in defining medical providers under the statute. See Phelps v. MacIntyre, 397 Mass. 459, 462-463 (1986).
5. Over Kay’s objection, photographs were admitted of Duvivier’s hair that were taken in 2000 and 2001. She testified that the photographs showed her appearance as it had been in 2004 just before she went to Kay’s. Other photographs were taken of her head immediately after her treatment at the MCHC, and were also admitted over Kay’s objection. As to the preinjury photographs, Kay’s argued that they were taken at a time too remote to be relevant.
‘To be admissible in evidence, a photograph must be shown to be accurate and bear enough similarity to circumstances at the time in dispute to be relevant and helpful to the jury in its deliberations. (Citations omitted.) The admissibility of photographs, as with other rulings on evidence, is largely committed to the discretion of the trial judge.” Henderson v. D’Annolfo, 15 Mass. App. Ct. 413, 428-429 (1983), citing, inter alia, Commonwealth v. Noxon, 319 Mass. 495, 536-537 (1946). Kay’s was free to try to impeach Duvivier’s testimony that the photographs, although taken three and four years earlier, were a fair representation of her hair as it appeared in 2004 before she went to Kay’s.
Kay’s objection to the postinjury photographs is that they were prejudicially inflammatory. “The question whether the inflammatory quality of a photograph outweighs its probative value and precludes its admission is determined in the sound discretion of the trial judge.” Commonwealth v. Pena, 455 Mass. 1, 12 (2009), quoting Commonwealth v. DeSouza, 428 Mass. 667, 670 (1999). That principle is controlling *35 here, particularly given the fact that the photographs were not included in the record before us.
6. At the outset of this case, Kay’s failed to file an answer to the complaint and was defaulted. Duvivier’s counsel prepared and had her sign a two-page affidavit to be presented at a hearing for the assessment of damages. After the hearing, the judge assessed damages at $150,000.00. The judgment was later vacated and the default removed.
During his cross-examination of Duvivier at trial, Kay’s counsel attempted to use the affidavit to impeach Duvivier. There were no statements in the affidavit inconsistent with Duvivier’s testimony, but Kay’s counsel began listing details of Duvivier’s testimony, for example, the names of witnesses and then pointing out that the detail was not included in the affidavit, insinuating that the detail was a recent invention. Duvivier’s counsel objected that the affidavit was not one in which such details would have been routinely included. The judge warned Kay’s counsel that he would take notice, and explain the circumstances, of the affidavit to the jury if Kay’s counsel continued that misleading line of inquiry. Kay’s counsel persisted, and the judge told the jury that the affidavit had been filed in connection with a previous default in which another judge assessed damages. Kay’s counsel objected, but did not suggest any other form of instruction. The judge did not tell the jury what figure had been assessed as damages by the other judge.
Kay’s counsel suggests that information about the default judgment informed the jury that a judge had found damages. The necessity for the judge’s intervention, however, was created by Kay’s counsel’s persistence in a line of questioning that, unexplained, would have left a false impression as to whether all facts should have been included in the affidavit. The judge’s action was entirely proper. See Murray v. Foster, 343 Mass. 655, 660 (1962).
7. A verdict amount of $500,000.00 is somewhat startling in district court practice. In this case, as we have seen, damages were assessed by another judge at $150,000.00 prior to an initial default judgment being vacated. As we have also seen, however, damages after default were assessed on the basis of an affidavit. The assessing judge, unlike the trial judge acting on the motion for new trial, did not have the benefit of Duvivier’s testimony and the rest of the evidence on which the jury based its damages verdict.
The question is not whether we would have awarded $500,000.00 in damages or allowed the motion for new trial or remittitur, but whether the trial judge abused his discretion in denying the motion. “ [S] imple disagreement with the size of the verdict does not alone actuate the court’s power, particularly if the award includes compensation for such intangibles as pain and suffering or mental anguish.” J.W. SMITH & H.B. ZOBEL, RULES PRACTICE §59.4, at 339 (2d ed. 2007). “Damages for emotional distress, although compensatory, are difficult to gauge for excessiveness, as are damages for pain and suffering.” Id. at 343. “The field of discretion of the trial judge in these matters is very broad. Only in rare instances can it be ruled that there has been an abuse of discretion amounting to an error of law.” Powers v. H.B. Smith Co., 42 Mass. App. Ct. 657, 665 (1997), quoting Davis v. Walent, 16 Mass. App. Ct. 83, 96-97 (1983). As the Supreme Judicial Court stated, in explaining appellate review of the trial judge’s exercise of discretion in this area:
If the trial judge had set this verdict aside as disproportionately high, *36 this court would have felt, on this record, that he was well justified in doing so. It is quite another thing, however, for this court to say that a judge has abused his discretion in reñiáng to set aside such a verdict (emphasis added).
Statkus v. Metropolitan Transit Auth., 335 Mass. 172, 174 (1956).
Judgment affirmed.
So ordered.

 The medical records included a reference to Duvivier's diabetes. After Duvivier testified that she had diabetes, Kay's counsel asked: "Now, has your doctor ever told you that that affects your hair?" Duvivier's counsel objected that the question called for hearsay testimony. After counsel conceded that the desired affirmative response would be offered for its truth, the objection was sustained. The ruling was appealed, but not briefed on appeal; and we treat the issue as having been waived. Dist./Mun. Cts. R. A. D. A., Rule 16(a) (4).